IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

UNITED STATES OF AMERICA         )
                                 )
          v.                     )          CR 317-001
                                 )
GEORGE MACK BIRD, III            )
_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

The indictment charges Defendant George Mack Bird, III, a physician and pharmacist, with a host of felonies related to the alleged dispensation of diet pills and narcotics in violation of the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801-902. (Doc. no. 1.)  Defendant moves to dismiss the indictment, compel access to information, suppress evidence and statements, and for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).  (Doc. nos. 26, 27, 37, 40, 41, 42, 62, 63.)  Upon consideration of the briefs and testimony and argument at the hearing on August 23, 2017, the Court **REPORTS** and **RECOMMENDS** Defendant's Motion to Dismiss (doc. no. 26), Motions for a Franks Hearing (doc. nos. 42, 63), Motion to Suppress Evidence from 821 Plaza Drive (doc. no. 40), and Motions to Suppress Statements (doc. nos. 27, 62) be **DENIED**.  The Court further **RECOMMENDS** Defendant's Motion to Suppress Evidence from Storage Unit Seventy-Seven (doc. no. 41) be **DENIED AS MOOT** and Defendant's Motion to Compel Access to Information (doc. no. 37) be **GRANTED IN PART** and **DENIED IN PART**.

## I.     FACTS

### A.     The Indictment

On March 8, 2017, the grand jury in the Southern District of Georgia charged Defendant under the CSA with one count of conspiracy, 173 counts of unlawful dispensation of controlled substances, one count of unlawful dispensation of controlled substances resulting in death, and one count of conspiracy to commit money laundering.  (Doc. no. 1.) The indictment alleges the following factual background and regulatory context.

The CSA prohibits the manufacture, distribution, or dispensation of controlled substances, with limited exceptions for medical professionals.  (Id. at 1.)  The CSA assigns controlled substances to one of five schedules based on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.  (Id.)

Under the CSA, licensed medical practitioners must register with the Drug Enforcement Agency ("DEA") in order to dispense controlled substances.  (Id. at 3) (citing 21 U.S.C. § 822(b); 21 C.F.R. § 290.1.  The CSA defines the term "dispense" as

> deliver[y] [of] a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery.

(Id. at 4) (citing 21 U.S.C. § 802(10)).   Registered practitioners may only dispense a controlled substance

> issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner.  An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of [the CSA] and the person

2

knowingly filling such a purported prescription, as well as the person issuing it, [is] subject to the penalties provided for violations of the provisions relating to controlled substances.

(Id. at 3-4) (quoting 21 C.F.R. § 1306.04(a)).

Defendant operated a gynecology practice, "Women's Health, PC," at 821 Plaza Avenue, Eastman, Georgia, and a weight loss clinic, "A New You Weight Loss Clinic," at 3037 Highway 257, Dublin, Georgia.  (Id. at 4.)  The indictment alleges Defendant rarely examined patients at either location despite routinely dispensing controlled substances, including hydrocodone combination products, carisoprodol, alprazolam, oxycodone, diazepam, tramadol, phentermine, and phendimetrazine.  (Id. at 5, 9-22.)  Defendant purportedly did not prescribe these controlled substances for a "legitimate medical purpose," nor did he prescribe them "in the usual course of his practice," as evidenced by his routine issuance of prescriptions in one or more of the following manners:

a)    Without adequate verification of the patient's medical complaint;

b)    Without adequate and reliable patient medical history to verify the accuracy of the patient's statements to the physician or other clinic personnel;

c)    Without performance of a complete or adequate physical or neurological examination;

d)    Without establishment of a true diagnosis;

e)    Without the use of appropriate diagnostic or laboratory testing;

f)    Without sufficient dialogue with the patient regarding treatment options (such as physical therapy or surgery), and risks and benefits of such treatments;

g)    Without establishing a treatment plan;

h)    Without consideration of or discussion with the patient regarding alternatives to treatment other than controlled substances;

i)      Without referral of the patient to a specialist in an effort to identify and correct the patient's alleged pain, or treat the patient for psychological dysfunctions by, for example, addiction counseling;

j)      Without any assessment of an individual patient's risk of abuse of controlled substances;

k)      Without provision of a means to monitor the patient's response to the medications;

l)      By prescribing inappropriate combinations of drugs to patients; and

m)      By dispensing and distributing controlled substances without the proper DEA registration.

(Id. at 7-8.)  Finally, the indictment alleges these practices generated more than $4,500,000 in proceeds deposited into accounts controlled by Defendant.  (Id. at 5.)

B.      Officer Riddle's Investigation

Angela Hardy is Defendant's former physician's assistant.  (Court's recording system, *For The Record*, (hereinafter "FTR"), 11:59:39 – 12:00:42.)  In April 2015, she contacted Oconee Drug Task Force Officer Tony Riddle and alleged Defendant's nurse, Jennifer Douglas, writes prescriptions pre-signed by Defendant.  (FTR 11:58:23 – 12:00:34)  Hardy alleged Defendant "hardly ever sees any patients," and Douglas distributes controlled substances from an in-house pharmacy at Defendant's Eastman office.  (FTR 12:00:35 – 12:02:46.)  Hardy further alleged Defendant distributes diet pills that are controlled substances from his Dublin office.  (FTR 12:02:18 – 12:02:25.)

One month later, in May 2015, Miranda Warren, a former girlfriend of Defendant, met with Officer Riddle and provided the following information:

[Warren] had been involved with [Defendant] ever since 2015.  He was hardly ever at the office.  The nurses and the staff was [sic] running the office while he was gone—that he would leave prescription pads already signed so they

4

could fill them out as needed to be when the patients come in.  He never went to the Dublin office hardly at all.  She said they would stay at his house for days without him going to either office.  When he did go by the Dublin office he picked up the cash and come back [sic] and counted it and burned the receipts in the fireplace.

(FTR 12:05:58 – 12:06:36.)

Hardy put Officer Riddle in contact with Judy Singletary, who received prescriptions for Norco, Tramadol, and Ambien from Defendant's office.  (FTR 12:06:52 – 12:07:14.) When Singletary attempted to fill the prescriptions at Wal-Mart, the pharmacists refused because the handwriting on the prescription did not look like Defendant's handwriting.  (FTR 12:07:22 – 12:07:36.)  Singletary admitted to the pharmacists Defendant was not at the office and his staff failed to take her vital signs.  (FTR 12:07:37 – 12:07:45.)   Officer Riddle confirmed Wal-Mart's refusal by interviewing pharmacist Trina Means.  (FTR 12:08:21 – 12:08:38.)

In May 2015, a female confidential informant ("CI") informed Officer Riddle that Jennifer Douglas sold pills at the Flash Foods convenience store in Milan, Georgia.  (FTR 12:09:14 – 12:09:45.)   In controlled purchases supervised by Officer Riddle, the CI purchased from Douglas thirty-three Xanax pills on May 19, 2015, and thirty Xanax pills on May 26, 2015.  (FTR 12:10:01 – 12:10:48.)

Rhonda Smith contacted Officer Riddle and alleged she called Defendant's office to get an appointment for a sinus infection and Defendant's office manager, Fran Douglas, told her to come into the office even though Defendant was not there.  (FTR 12:11:36 – 12:12:01.)  Jennifer Douglas saw Smith and wrote a prescription after several phone calls and a text to Defendant.  (FTR 12:12:02 – 12:12:46.)  Approximately one week later, Smith received a phone call from the RVG pharmacy in Texas asking if she still wanted the pain

patch for which Defendant had issued her a prescription. (FTR 12:13:06 – 12:13:25.) However, Smith never asked for or received a prescription for a pain patch. (FTR 12:13:26 – 12:14:02.)

### C. Affidavit in Support of the First Search Warrant for Defendant's Eastman Office

Officer Riddle obtained a search warrant from Dodge County Superior Court Judge Frederick Mullis, Jr., on May 27, 2015. (FTR 12:14:03 – 12:15:07; doc. no. 50-1.) The scope of the search warrant included "the office, up stairs and down stairs, and property of Dr. Mack Bird at 821 Plaza Drive, Eastman, Ga." (Doc. no. 50-1, p. 5.) The warrant authorized a search for (1) pre-signed or illegally issued prescriptions; (2) illegal controlled substances; (3) records relating to financial transactions connected to drug trafficking; (4) records relating to the distribution of controlled substances; (5) records reflecting the names, addresses, and telephone numbers of any co-conspirators; (6) money connected to drug trafficking; (7) photographs or videos of controlled substances or co-conspirators; (8) safes or strong boxes; (9) firearms; and (10) any evidence of a violation of the Georgia Controlled Substances Act [O.C.G.A. § 16-13-41]. (Id. at 6.)

In the search warrant affidavit, Officer Riddle set forth the investigative facts detailed *supra*, including (1) Angela Hardy's allegations regarding Defendant's office practices; (2) Miranda Warren's information regarding Defendant's absence from his offices; (3) Judy Singletary's prescription that was rejected by Wal-Mart; and (4) Rhonda Smith's information about Douglas writing her a prescription and the call regarding the pain patch. See supra § I.B.; (id. at 9-10.) Officer Riddle also included the following additional information in the affidavit.

6

On April 2, 2015, LaJoy Scurry told Angela Hardy she went to Defendant's office for a sinus problem and only saw Douglas. (Doc. no. 50-1, p. 9.) Douglas tried to write a prescription for her, but was too shaky, and asked Scurry to write it instead. (Id.) Scurry refused and left. (Id.) Hardy also stated Julie Rowland, a former nurse, was fired for refusing to write pre-signed prescriptions. (Id.) Hardy also indicated Defendant never sees any of the patients who go to his diet medication practice in Dublin. (Id.)

Miranda Warren told Officer Riddle she only saw Defendant go to the Dublin office once. (Id.) Warren also stated Defendant always had a backpack with narcotics, cash, and a handgun, and had large amounts of cash stashed under his bed in his Eastman apartment in case he ever got in trouble and had to leave town. (Id.) Additionally, Warren alleged Defendant had a dresser in the apartment with narcotics prescribed to himself and others. (Id.)

At the evidentiary hearing on August 23, 2017, Miranda Warren testified concerning several inaccuracies in Officer Riddle's affidavit regarding the information she provided. Warren testified, contrary to the information in the affidavit, she saw Defendant go to his Dublin office more than once and Defendant did not always carry a backpack filled with narcotics, cash, and a handgun. (FTR 11:40:33 – 11:41:13.) She also did not recall telling Officer Riddle Defendant's dresser was filled with narcotics prescribed to himself and other people. (FTR 11:41:43 – 11:42:12.)

On cross-examination, however, Warren testified she saw Defendant go to the Dublin office only once a week on average, primarily on Fridays, to pick up money. (FTR 11:45:53 – 11:46:48.) Warren also testified Defendant carried around a backpack with cash and pills, but she was unsure if there was a handgun and could not identify the pills. (FTR 11:46:54 –

11:47:34.)  Finally, Warren confirmed there were numerous pills in Defendant's dresser, but they were in unlabeled bottles and she could not identify what kind of pills they were.  (FTR 11:48:10 – 11:48:36.)

### D.   Hearing Testimony Regarding Execution of the First Search Warrant for Defendant's Eastman Office

At the hearing on August 23, 2017, Defendant, Officer Riddle, and DEA Investigator Charles Sikes gave testimony regarding the manner of execution of the first Eastman office search warrant.

### 1.   Testimony of Defendant

On June 3, 2015, at approximately 9:00 to 9:30 a.m., Defendant was in an exam room with a patient when he heard doors slamming, women screaming, and men shouting.  (FTR 10:49:14 – 10:49:56.)   An officer burst into the exam room wearing SWAT gear, guns, handcuffs, an ammunition belt, and combat boots.  (FTR 10:49:57 – 10:50:19.)  The officer told Defendant, "You need to come with me," and instructed the patient to get dressed.  (FTR 10:51:18 – 10:51:38.)

The officer led Defendant to the corner of the file room in the front of the office, where he joined employees Erin Mullis, Fran Douglas, and Jennifer Douglas.  (FTR 10:52:19 – 10:52:48.)   Fran Douglas asked the guard what is going on, to which he responded Defendant and Jennifer Douglas are under arrest.  (FTR 11:05:01 – 11:05:12.)  Fran Douglas fainted.  (FTR 11:05:15 – 11:05:16.)  Defendant asked if he could take her to the emergency room or get a blood pressure cuff to take her vital signs, but the officers refused.  (FTR 11:05:22 – 11:05:37.)  An officer armed with an assault rifle stood guard over the entrance to the file room, and he told Defendant to stay in the corner and they would get him in a minute.

(FTR 11:03:54 – 11:04:30.)  Another officer with an assault rifle stood at the waiting room entrance, standing guard over Defendant's patients.  (FTR 11:02:45 – 11:03:14.)

Ten to twelve officers entered the office and conducted the search wearing black SWAT gear and handguns.  (FTR 10:51:44 – 10:52:15, 11:22:10 – 11:22:44, 11:23:15 – 11:23:48.)  At least four of them had AR-15 assault rifles.  (FTR 11:23:21 – 11:23:36.)

Four officers came into the file room and escorted Defendant down the hall to his office, with two officers walking in front of Defendant and two behind him.  (FTR 11:05:46 – 11:06:04.)  The head of the Oconee Drug Task Force was running up and down the hall waving his gun and screaming because he wanted keys to the office.  (FTR 11:06:05 – 11:06:15, 11:24:09 –11:24:35.)  Defendant was scared and told Officer Riddle he would like to have his lawyer present.  (FTR 11:06:16 – 11:06:23.)  Officer Riddle responded, "No, you don't need that now."  (FTR 11:06:29 – 11:06:31.)

Entering Defendant's office at the end of the hall, the officers ordered Defendant to sit behind his desk.  (FTR 11:08:13 – 11:08:20.)  Three officers sat on a bench seat across from Defendant, and one officer with an assault rifle stood guard at the only entrance to the office during the entire interview.  (FTR 11:08:27 – 11:08:41, 11:15:27 – 11:16:15.)

Before any questioning began, the officer in charge of the Oconee Drug Task Force burst into the office and started berating Defendant about the keys, then asked if he had a gun.  (FTR 11:09:59 – 11:10:26, 11:24:09 – 11:24:35.)  Defendant showed him where his gun was located inside his desk, and two officers pointed guns at Defendant and told him to back away.  (FTR 11:10:27 – 11:10:54.)  When the officer began questioning Defendant about the keys again, Defendant told him they were in his orange backpack.  (FTR 11:10:55 – 11:11:05.)  Complying with the officer's order, Defendant dumped out his key ring that

9

contained all keys to his vehicle, office, and house, and the officer grabbed the keys and exited the room.  (FTR 11:11:10 – 11:11:47.)

The officers told Defendant to have a seat again, and Investigator Sikes, who was armed with a handgun, handed Defendant a form for voluntary surrender of his DEA license. (FTR 11:12:29 – 11:12:41, 11:29:14 – 11:29:28.)  Investigator Sikes told Defendant he could sign now and get his license back in a few months or refuse to sign and never get his license back.  (FTR 11:12:42 – 11:12:50.)  Defendant again asked for a lawyer, but Investigator Sikes told him he did not need one at that point.  (FTR 11:12:51 – 11:12:56.)  Defendant signed the surrender form.  (FTR 11:13:11 – 11:13:13.)

Officers started peppering Defendant with questions.  (FTR 11:13:20 – 11:13:24.) Defendant did not volunteer any information but answered their questions because he felt like he had to do so.  (FTR 11:13:41 – 11:14:23.)  No one told Defendant he did not have to answer questions.  (FTR 11:23:59 – 11:24:05.)  At no point did anyone read or show Defendant his Miranda rights.  (FTR 11:14:41 – 11:15:08, 11:34:24 – 11:34:48.)

The interview lasted approximately fifteen to twenty minutes.  (FTR 11:16:40 – 11:16:44.)  Thereafter, the officers handcuffed Defendant and led him outside to a police cruiser.  (FTR 11:16:45 – 11:17:22.)  Defendant testified no one was free to leave at any point during the entire search.  (FTR 11:17:26 – 11:17:40.)

### 2.    Testimony of Officer Riddle

Officer Riddle executed the search warrant along with three other Oconee Drug Task Force officers, two DEA personnel, and two Eastman police officers.  (FTR 12:15:10 – 12:15:44.)  The two Eastman police officers were in their road deputy uniforms and did not enter the office.  (FTR 12:15:45 – 12:16:07.)  The four Task Force officers and one DEA

agent wore their normal uniforms with bulletproof vests and handguns.  (FTR 12:16:29 – 12:17:24.)  DEA Investigator Charles Sikes did not have a handgun because he was a diversion investigator and was not authorized by the DEA to either carry a handgun or participate in the initial entry of a location to be searched.  (FTR 12:17:45 – 12:18:05.)  None of the eight officers carried assault rifles or long guns.  (FTR 12:17:24 – 12:17:34, 12:44:52 – 12:45:14.)

Five officers made initial entry into the office, while Investigator Sikes waited outside with the Eastman police officers.  (FTR 12:18:06 – 12:18:19.)  Although there was also a side and back door, all five officers came through the front door.  (FTR 12:18:26 – 12:18:50.)  Officer Riddle presented the warrant to Fran Douglas at the front office, and the officers began their search.  (FTR 12:18:51 – 12:19:07.)

One of the Drug Task Force officers stayed in the lobby with the patients and interviewed them, allowing each to leave after being interviewed.  (FTR 12:20:28 – 12:20:58.)  As Officer Riddle entered the hall, he saw Erin Mullis and Jennifer Douglas entering the hall from other rooms.  (FTR 12:21:04 – 12:21:22.)  Officers asked Mullis and Douglas to go to the front.  (FTR 12:21:46 – 12:21:50.)  As Defendant approached, Officer Riddle asked if he would mind talking to them in his office for a minute, to which Defendant responded by walking to his office.  (FTR 12:21:50 – 12:22:32.)

Defendant went into his office, and Investigator Sikes entered with Officer Riddle.  (FTR 12:22:33 – 12:22:43.)  Defendant sat behind his desk, while Officer Riddle and Investigator Sikes sat in two chairs in front of the desk.  (FTR 12:22:51 – 12:23:10.)  Investigator Sikes partially closed the door to the office.  (FTR 12:23:56 – 12:24:00, 12:38:50 – 12:39:02.)  Investigator Sikes asked Defendant for permission to talk to him and

explained Defendant did not have to talk.  (FTR 12:24:57 – 12:25:05.)  Defendant stated he wanted to talk to them.  (FTR 12:25:00 – 12:25:05.)  Investigator Sikes told Defendant he was free to leave, but Defendant never expressed a desire to leave.  (FTR 12:25:06 – 12:25:16.)

Investigator Sikes interviewed Defendant for approximately thirty to forty minutes. (FTR 12:23:39 – 12:23:48.)  The interview was not videotaped or recorded.  (FTR 12:55:20 – 12:55:27.)  Approximately fifteen minutes after the meeting began, Investigator Sikes noticed a glass case containing a box of shotgun shells and Defendant repeatedly reaching toward a left drawer in his desk.  (FTR 12:25:40 – 12:25:59.)  Investigator Sikes stopped the interview and told Defendant to stand so they could check the office for weapons.  (FTR 12:26:00 – 12:26:12.)  DEA Agent Van Wynn entered the office to assist.  (FTR 12:26:44 – 12:26:55.)  Officers found a handgun in the left desk drawer and a rifle and shotgun in a connected room.   (FTR 12:26:13 – 12:26:19, 12:27:19 – 12:27:29.)   No one pointed a weapon at Defendant during the interview, even during this search for weapons.   (FTR 12:27:30 – 12:27:45.)

After finishing the interview, Defendant went to the front of the office to wait with the other employees.  (FTR 12:28:10 – 12:28:38.)  Approximately one hour after the interview, officers arrested and handcuffed Defendant.  (FTR 12:28:39 – 12:28:54.)

During the search, officers found identical examination forms pre-signed by Defendant for placement in different patient files, along with documents showing multiple patients with the same symptoms.  (FTR 12:30:06 – 12:32:18.)  Based on this information, Officer Riddle decided to seek a second search warrant to seize patient files.  (FTR 12:30:40 – 12:32:18, 12:51:46 – 12:52:16.)

12

### 3.     Testimony of Investigator Sikes

In late May 2015, the Oconee Drug Task Force contacted Investigator Sikes' supervisor and asked for DEA assistance with investigating Defendant and executing the search warrant.  (FTR 14:03:17 – 14:04:23.)  On June 3, 2015, four Oconee Drug Task Force officers, DEA Investigator Sikes, DEA Agent Van Wynn, and two Eastman police officers executed the warrant.  (FTR 14:04:24 – 14:04:50.)  Investigator Sikes wore a DEA t-shirt with either jeans or khaki pants and was not carrying a firearm or wearing a bulletproof vest during execution of the search.  (FTR 14:06:25 – 14:07:08.)  Other officers wore bulletproof vests and carried firearms and handcuffs.  (FTR 14:20:44 – 14:21:18.)  No officer or agent involved in the search carried any type of long gun or a rifle.  (FTR 14:10:28 – 14:10:42.)

Before execution of the search warrant, all participating officers attended a briefing where they discussed their specific roles.  (FTR 14:04:59 – 14:05:11.)  Once the office was secure, Officer Curtis Hey was to interview patients, Officer Riddle and Investigator Sikes were to interview Defendant and his employees, and three officers were to conduct the search.  (FTR 14:05:12 – 14:05:28.)  The two Eastman police officers were to wait outside.  (FTR 14:04:24 – 14:04:50.)

As a diversion investigator, Investigator Sikes was not allowed to carry a weapon or be part of the entry team, and he thus waited outside while officers entered the office and secured it.  (FTR 14:05:51 – 14:06:22.)  The initial entry team did not breach the door, break any windows, or use any speakers in announcing the search warrant; they just walked in the front door.  (FTR 14:07:17 – 14:07:54.)

After officers secured the building, Investigator Sikes entered the office and saw a

few people in the lobby and a few employees on the other side of the front office.  (FTR 14:07:55 – 14:08:32.)  There was no screaming, yelling, running, or pointing of firearms. (FTR 14:08:33 – 14:08:50.)  Investigator Sikes walked down the hall and into Defendant's office with Officer Riddle, partially closing the office door behind him.  (FTR 14:09:47 – 14:10:02, 14:10:18 – 14:10:20.)  No one was in the office except Investigator Sikes, Officer Riddle, and Defendant.  (FTR 14:10:08 – 14:10:14.)

Once seated in the office, Investigator Sikes showed Defendant his credentials as a DEA diversion investigator and informed Defendant he was not under arrest, did not have to speak with them, was free to leave, and did not have to answer questions.  (FTR 14:10:53 – 14:11:06, 14:11:21 – 14:11:26.)  Defendant did not express a desire to leave and, in fact, seemed eager to talk.  (FTR 14:11:27 – 14:11:58.)  Defendant was content and cooperative throughout the interview and never requested an attorney.  (FTR 14:12:11 – 14:12:19.)  The interview lasted approximately forty-five minutes.  (FTR 14:15:32 – 14:15:38.)  None of it was recorded, nor did DEA policies and procedures require a recording.  (FTR 14:26:40 – 14:28:32.)

As Investigator Sikes was asking Defendant general questions about his practice and medical training, he noticed a box of shotgun shells next to a piece of furniture in the office. (FTR 14:12:20 – 14:12:45.)  Investigator Sikes stopped the interview and called in Agent Wynn to assist in checking the office for weapons.   (FTR 14:12:45 – 14:13:09.) Investigator Sikes asked Defendant to stand up and back away from his desk because he saw Defendant repeatedly reach for a desk drawer during the first part of the interview. (FTR 14:13:10 – 14:13:26.)  When asked whether he had any loaded weapons, Defendant responded he had a loaded revolver in the desk, which he unloaded at the request of

Investigator Sikes.   (FTR 14:13:28 – 14:13:36.)   Meanwhile, Agents Wynn and Officer Riddle found two long guns and unloaded them.  (FTR 14:13:37 – 14:13:45.)

After removing these guns, Investigator Sikes continued the interview with no change in demeanor from Defendant.  (FTR 14:13:50 – 14:13:58.)   During the last half of the interview, Investigator Sikes confronted Defendant concerning pre-signed prescriptions in his office.  (FTR 14:14:15 – 14:14:27.)   Defendant admitted on occasion to reviewing patient books and preparing prescriptions in advance for patients.   (FTR 14:14:31 – 14:14:41.)

Based on this admission by Defendant, Investigator Sikes asked Defendant if he would be willing to surrender his DEA registration.   (FTR 14:14:41 – 14:15:00.) Investigator Sikes presented a voluntary surrender form, read it aloud, and asked Defendant to sign it.  (FTR 14:15:07 – 14:15:12.)  Defendant signed the form, put his head down on his desk, started crying, and said he knew this day was coming, at which point Investigator Sikes ended the interview.  (FTR 14:15:15 – 14:15:32.)  Defendant was not handcuffed or arrested immediately after the interview and instead was allowed to roam the office while the team finished the search.  (FTR 14:15:39 – 14:16:15.)

Following the interview, Investigator Sikes found a series of preprinted examination notes with identical history narratives, treatment narratives, and reactions to treatment plans, all pre-signed by Defendant with the patient name left blank.  (FTR 14:16:16 – 14:17:42.)  Investigator Sikes concluded Defendant was acting outside the usual course of professional practice.  (FTR 14:17:44 – 14:17:58.)  Based on this information, along with a finding of pre-signed prescription pads and large amounts of hydrocodone, officers arrested Defendant.  (FTR 14:36:14 – 14:36:45.)

**E.      Affidavit in Support of the Second Search Warrant for Seizure of Office Records at Defendant's Eastman Office**

Judge Mullis signed the second search warrant on June 3, 2015.  (Doc. no. 50-2.)  In his affidavit of support, Officer Riddle included the same factual basis as in the first affidavit, as well as the following additional facts:

> On 06/03/2015 Oconee Drug Task Force Agents along with the DEA Diversion unit executed a search warrant on the office of Dr. Mack Bird in Eastman.  The findings in the case were as follows:
>
> Prefilled prescription pads signed by the doctor
>
> Large amount of hydrocodone pills in the doctors [sic] apartment
>
> Large sums of cash in the doctors [sic] apartment
>
> 3 firearms
>
> Several bottles of different schedule II drugs written to the doctor by himself.
>
> Generic forms that were used all had the doctors [sic] signature photo copied and used in each persons [sic] personal records
>
> Personal records with photo copies of prescriptions that have been issued in [sic] days the doctor was not in the office.
>
> Looking at evidence found it appears that the majority of the office is more of a pain clinic
>
> In lieu of these findings the DEA Diversion team would like to take possession of the personal records for Dr. Mack Bird for further investigation.  The DEA would be responsible for the security of the records.

(Doc. no. 50-2, pp. 9-10.)  Judge Mullis asked Officer Riddle the meaning of "personal records" when signing the second warrant, and Officer Riddle clarified the term referred to patient records from Defendant's office.  (FTR 12:34:02 – 12:34:16.)

## II.      DISCUSSION

### A.      The Dismissal Motion Incorrectly Contends the CSA Is Unconstitutionally Vague or Uncertain by Invoking the Standard of a Practitioner's Usual Course of His Professional Practice.

Counts 1 to 175 allege Defendant violated the CSA by issuing prescriptions for controlled substances outside the scope of 21 C.F.R. § 1306.04(a), which authorizes issuance of prescriptions "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Defendant contends § 1306.04(a) is unconstitutionally vague because it contains no uniformly defined "standard of care," and therefore the indictment must be dismissed.[1]  (Doc. no. 26, pp. 4-5.)  Eleventh Circuit precedent forecloses Defendant's argument.

A criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983).  Stated differently, the law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and cannot leave government actors "free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." United States v. Matchett, 837 F.3d 1118, 1122 (11th Cir. 2016) (internal quotations omitted).

Here, longstanding precedent forecloses Defendant's vagueness challenge to the CSA

---

[1]Defendant originally argued § 1306.04(a) adopts a subjective standard of care.  (Doc. no. 26, p. 3.)  However, at the evidentiary hearing, Defendant conceded the standard of care is objective as explained in the government's brief.  (FTR 14:50:50 – 14:55:30.)

and 21 C.F.R. § 1306.04(a).  In <u>United States v. Collier</u>, 478 F.2d 268, 270 (5th Cir. 1973),[2] the seminal case in this Circuit, the defendant physician was convicted under the CSA of distributing methadone.  On appeal, he argued the phrase "in the course of his professional practice" does not "warn the physician of what conduct is proscribed, and that the statute is without objective standards and is subject to diverse interpretation."  <u>Id.</u> at 271-72 (citations omitted).  The Court held "in the course of his professional practice" restricts a physician "to dispensing or prescribing drugs in the bona fide treatment of a patient's disease . . . ."  <u>Id.</u> at 272.  This standard is not void for vagueness, the Court found, merely because it does not "delineate the precise circumstances constituting the bounds of permissible practice . . . ."  <u>Id.</u>  The Court reasoned "a licensed practitioner is not immune from the act solely due to his status," and "Congress did not intend for doctors to become drug 'pushers.'"  <u>Id.</u> at 271-72; <u>see also</u> <u>United States v. Rosen</u>, 582 F.2d 1032, 1035 (5th Cir. 1978) ("[U]nder the guise of treatment a physician cannot sell drugs to a dealer nor distribute drugs intended to cater to cravings of an addict.").

Citing <u>Collier</u>, courts within the Eleventh Circuit have consistently rejected the same void-for-vagueness challenge Defendant asserts in his motion to dismiss.  <u>See, e.g.</u>, <u>United States v. Couch</u>, No. CR 15-00088-CG-B, 2016 WL 7427216, at *4 (S.D. Ala. Dec. 23, 2016) ("[C]ourts have repeatedly rejected physicians' void-for-vagueness arguments as they relate to the CSA."); <u>United States v. Bourlier</u>, No. 3:10CR30 MCR, 2011 WL 30301, at *2 (N.D. Fla. Jan. 4, 2011) (rejecting Defendant's void-for-vagueness challenge to CSA). Accordingly, the CSA and 21 C.F.R. § 1306.04(a) are not unconstitutionally vague and

---

[2]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

dismissal of the indictment is not warranted.

Defendant similarly invokes the uncertainty of law defense, which provides "'when the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it.'" United States v. Heller, 830 F.2d 150, 154 (11th Cir. 1987) (quoting United States v. Critzer, 498 F.2d 1160 (4th Cir. 1974)). However, as discussed *supra*, the CSA is neither vague nor highly debatable in its application to physicians. Moreover, as the government noted in its brief and Defendant does not dispute, the uncertainty of law defense has been narrowly applied in the context of tax evasion cases to negate the element of willfulness. (Doc. no. 52, p. 4.) To put it succinctly, as defense counsel conceded at oral argument, "[T]here are a lot of bad cases . . . on this issue . . . for a defendant." (FTR 2:53:33 – 2:53:48.) As nothing warrants dismissal of the indictment, the Court **RECOMMENDS** Defendant's Motion to Dismiss be **DENIED**. (Doc. no. 26.)

## B.      There Is No Need for a **<u>Franks</u>** Hearing.

Defendant argues the Court must hold a <u>Franks</u> hearing because Officer Riddle recklessly omitted material facts in his warrant affidavit. (Doc. nos. 42, 63; FTR 11:36:56 – 11:55:51.) Should, after a <u>Franks</u> hearing and removal of the facts infected by false statements or omissions, the Court find the affidavit's remaining content insufficient to establish probable cause, it must void the search warrant and exclude the fruits of the search. <u>Franks v. Delaware</u>, 438 U.S. 154, 156 (1978).

A defendant attacking a search warrant as fraudulently obtained must, in order to qualify for a <u>Franks</u> evidentiary hearing, make a "substantial preliminary showing" that (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is

necessary to the finding of probable cause . . . ." Id. at 155-56.  This "substantial preliminary

showing" is a high bar.  As the Eleventh Circuit has explained,

> "To mandate an evidentiary hearing, the challenger's attack must be more than
> conclusory and must be supported by more than a mere desire to cross-
> examine.  There must be allegations of deliberate falsehood or of reckless
> disregard for the truth, and those allegations must be accompanied by an offer
> of proof.  They should point out specifically the portion of the warrant
> affidavit that is claimed to be false; and they should be accompanied by a
> statement of supporting reasons.  Affidavits or sworn or otherwise reliable
> statements of witnesses should be furnished, or their absence satisfactorily
> explained."

United States v. Arbolaez, 450 F.3d 1283, 1294 (11th Cir. 2006) (quoting Williams v.

Brown, 609 F.2d 216, 219 (5th Cir. 1979)); see also United States v. Votrobek, 847 F.3d

1335, 1342 (11th Cir. 2017) (quoting Franks, 438 U.S. at 171) ("'Allegations of negligence

or innocent mistake are insufficient,' and the defendant's 'attack must be more than

conclusory and must be supported by more than a mere desire to cross-examine.'").  Franks

not only applies to affirmative misrepresentations but also material omissions in a warrant

affidavit.  Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997).

   Here, Defendant argues he has made the showing for a Franks hearing because

Officer Riddle (1) omitted facts showing Angela Hardy's substantial bias and motive to

fabricate evidence; (2) placed substantial weight on the illegal activities of Jennifer Douglas

despite no evidence Defendant was involved; (3) omitted information about law enforcement

threats against Miranda Warren; and (4) misstated information received from Miranda

Warren.  (Doc. nos. 42, 63; FTR 11:36:56 – 11:55:51.)  None of these contentions rise to the

level necessary to trigger the right to a Franks hearing.

   First, although he details Hardy's many possible motives for fabrication, Defendant

fails to present evidence suggesting any of Hardy's statements were untrue.  Hardy gave

Officer Riddle detailed, firsthand observations and information of the illegal activities at Defendant's office.  She also put Officer Riddle in touch with independent sources who strongly corroborated Hardy's information, including Judy Singletary, Rhonda Smith, and Katrina Means.

Moreover, officers did not learn of any potential bias by Hardy until after Officer Riddle obtained the search warrants on May 27, 2015, and June 3, 2015.  The DEA discovered that a patient had sued Hardy, and Hardy blamed Defendant for the lawsuit, during a DEA interview on July 30, 2015, well after execution of the search warrant.  (Doc. no. 63, pp. 1-2, 6.)  Only after that interview did investigators notify Hardy she was also a target of the investigation.  Defendant makes the conclusory claim that "the failure of officer [sic] Riddle to discover these clear indications of bias against Defendant at the time the search warrants were issued represents a reckless disregard for the truth . . . ." (Doc. no. 63, p. 2.)  Such a failure indicates at most negligence, particularly given the detailed and independently corroborated information Hardy provided.

Perhaps more importantly, the mere failure to include reasons an informant might be biased does not, by itself, constitute a false statement under Franks.  See United States v. Haimowitz, 706 F.2d 1549, 1556 (11th Cir. 1983) (rejecting challenge to denial of Franks hearing based on affidavit's omission of information about informant's credibility where character of statements was firsthand and other sources corroborated informant's statements); United States v. Taylor, No. CR 14-0303-CG, 2015 WL 5923580, at *2 (S.D. Ala. Oct. 12, 2015) ("[T]he Eleventh Circuit and other courts have cast a dim view on the argument that omission of details about [an informant]'s criminal history and potential biases triggers a Franks remedy.").

Second, Defendant contends the affidavit places "substantial weight" on the illegal activities of Jennifer Douglas without connecting Defendant to them. The connection is, however, quite obvious. Douglas was Defendant's employee and allegedly distributed controlled substances obtained from Defendant's office. Given the additional, compelling facts alleged in the affidavit of criminal prescription drug practices by Defendant, aided and abetted by Douglas, it was reasonable to infer Defendant's involvement in this related scheme. This connection is enough to satisfy the requirement of probable cause and woefully inadequate to suggest a deliberate falsehood or reckless disregard of the truth by Officer Riddle.

Third, Defendant contends law enforcement threatened Miranda Warren with criminal charges and having her children taken away by the Department of Children and Family Services, but promised nothing would happen if she provided testimony against Defendant. (Doc. no. 63, p. 3.) At the evidentiary hearing, Warren confirmed state law enforcement officers threatened her with charges and taking her children away in order to encourage her to testify against Defendant. (FTR 11:49:04 – 11:50:20.) However, Warren testified she was threatened after she gave Officer Riddle the information contained in his affidavits and after Officer Riddle executed both affidavits. (FTR 11:52:50 – 11:53:35, 11:54:46 – 11:55:36.)

Fourth, Defendant attempts to show Officer Riddle overstated information provided by Miranda Warren by comparing his affidavit description to her testimony at the hearing. However, Officer Riddle's description varies only slightly from Warren's testimony. Rather than seeing him go once to the Dublin office, Warren saw Defendant go merely a few times when the clinic was open. (FTR 11:45:45 – 11:46:42.) His primary reason for ever visiting the Dublin office was to obtain the cash generated by it. (FTR 11:45:45 – 11:46:42.) In

22

addition, although Warren never stated Defendant had narcotics in his backpack and dresser, Warren did state Defendant had large amounts of cash and pills in both locations. (FTR 11:46:51 – 11:47:46, 11:47:50 – 11:48:35.) Such minor differences do not qualify as deliberate falsehoods or a reckless disregard for the truth.

Accordingly the Court **RECOMMENDS** Defendant's Motions for a <u>Franks</u> hearing be **DENIED**. (Doc. nos. 42, 63.)

> **C.** **Evidence Seized from the Searches of 821 Plaza Drive Should Not Be Suppressed Because the Search Warrants Were Supported by Probable Cause and Procured in Good Faith.**

Defendant argues the two search warrants obtained for the Eastman office and patient files were not supported by probable cause and violated the Federal Rules of Criminal Procedure because they were issued by a Georgia Superior Court Judge rather than a U.S. Magistrate Judge. (Doc. no. 40, pp. 2-8.) As explained below, both search warrants were supported by probable cause because they connect Defendant to both the Eastman office and apartment and connect Defendant to criminal activity. Moreover, even if both warrants lacked probable cause, they fall well within the <u>Leon</u> good faith exception to the exclusionary rule. Finally, a Georgia Superior Court Judge properly issued both warrants.

> **1.** **The Standard for Evaluating Probable Cause**

In deciding whether to sign a search warrant, the issuing judge must make a "practical, common sense decision" whether, given all the information in the supporting affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>United States v. Jiminez</u>, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)). "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]" <u>United States v.</u>

Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 462 U.S. at 232).  The

validity of the warrant is evaluated based on the totality of the circumstances.  Id.; see also

United States v. Flowers, 531 F. App'x 975, 981 (11th Cir. 2013) ("Probable cause to

support a search warrant exists when the totality of the circumstances allow a conclusion that

there is a fair probability of finding contraband or evidence at a particular location.").

Also, the affidavit in support of the search warrant application "'should establish a

connection between the defendant and the residence to be searched and a link between the

residence and any criminal activity.'"  United States v. Mitchell, 503 F. App'x 751, 754

(11th Cir. 2013) (quoting United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002)).  As

to providing the nexus between the items being sought and the residence of a defendant, "the

affidavit must supply the authorizing magistrate with a reasonable basis for concluding that

Defendant might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'"

United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting United States v.

Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999)).

In the Eleventh Circuit, a court reviewing the decision of a judicial officer concerning

the existence of probable cause gives "great deference" to that determination.  United States

v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011) (citing Brundidge, 170 F.3d at 1352).

Thus, "the duty of a reviewing court is simply to ensure that the [judge] had a 'substantial

basis for . . . conclud[ing]' that probable cause existed."  Cauchon v. United States, 824 F.2d

908, 911-12 (11th Cir. 1987) (quoting Gates, 462 U.S. at 238-39).

### 2. Officer Riddle's Affidavit Established a Sufficient Nexus Between the Property to be Searched, the Criminal Conduct Alleged, and Defendant.

Defendant contends Officer Riddle's affidavit fails to establish the proper nexus

between Defendant and the alleged criminal activity because (1) the affidavit implicates Jennifer Douglas and not Defendant; (2) the information obtained from Angela Hardy and Miranda Warren is improperly infected with bias; (3) the affidavit fails to allege illegal activity at the Eastman rather than Dublin office; and (4) there was no probable cause to investigate the Eastman upstairs living space in addition to the downstairs office.  (Doc. no. 40, pp. 3-7.)

An affidavit in support of a search warrant must connect a defendant to a location and that location to criminal activity, not a defendant directly to criminal activity.  Mitchell, 503 F. App'x at 754.  Here, the Eastman office was directly connected to Defendant, as it was his medical practice and his part-time apartment.  Moreover, it was clear from the controlled buys and the sources Officer Riddle interviewed that Jennifer Douglas was selling Xanax obtained from the location and distributing pre-signed prescriptions from the medical practice.  Thus, both the required links are satisfied.

In addition, there is evidence directly connecting Defendant to criminal activity in the medical office and upstairs apartment.  Hardy, Warren, Singletary, and Smith alleged Defendant pre-signed prescription pads at his Eastman medical office so that his staff could issue prescriptions for patients Defendant did not see.  Warren further alleged Defendant stored numerous pills in his apartment dresser and large amounts of cash under his bed to aid in any flight from authorities.  Thus, Officer Riddle's affidavit established the requisite nexus required for probable cause.  Id.

Moreover, as previously discussed, see supra § II.B., the potential biases of Hardy and Warren do not undermine the reliability of their information.  Three independent, unbiased sources corroborated significant portions of their allegations, and this substantial

25

corroboration supports a finding of probable cause.  See United States v. Hyde, 574 F.2d

856, 863 (5th Cir. 1978) ("When three unreliable but unconnected persons all report the same

fact, it is probable that the fact is true.").   Indeed, even if the affidavit had included

information about Hardy's and Warren's alleged biases, the judge could have made a

"practical, common sense decision" that, given the totality of information in Officer Riddle's

affidavit, there was "a fair probability that contraband or evidence of a crime" would have

been found at 821 Plaza Drive.  Jiminez, 224 F.3d at 1248.

> **3.     The Second Affidavit Included Additional Facts Supporting Probable Cause.**

Defendant contends the second search warrant for patient files is invalid because (1)

Officer Riddle used the same facts in the second affidavit as in the first and there was no

new probable cause determination; and (2)  the "personal records" sought in the second

warrant were not connected to any crime.  (Doc. no. 40, pp. 7-8.)

Contrary to Defendant's contention, Officer Riddle included in his second search

warrant affidavit the following new facts garnered from the first search, in addition to the

facts contained in his original affidavit:

> On 06/03/2015 Oconee Drug Task Force Agents along with the DEA
> Diversion unit executed a search warrant on the office of Dr. Mack Bird in
> Eastman.  The findings in the case were as follows:
>
> Prefilled prescription pads signed by the doctor
>
> Large amount of hydrocodone pills in the doctors [sic] apartment
>
> Large sums of cash in the doctors [sic] apartment
>
> 3 firearms
>
> Several bottles of different schedule II drugs written to the doctor by himself.

Generic forms that were used all had the doctors [sic] signature photo copied and used in each persons [sic] personal records

Personal records with photo copies of prescriptions that have been issued in days the doctor was not in the office.

Looking at evidence found it appears that the majority of the office is more of a pain clinic

In lieu of these findings the DEA Diversion team would like to take possession of the personal records for Dr. Mack Bird for further investigation.  The DEA would be responsible for the security of the records.

(Doc. no. 50-2, pp. 9-10.)  Such use of additional facts found during a first search to support a finding of probable cause for an additional search is appropriate.  See, e.g., United States v. Benson, No. 507-CR-19 WDO, 2007 WL 1812638, at *3 (M.D. Ga. June 19, 2007) (approving second search warrant where probable cause was "based primarily on the first hand knowledge of Agent Eppinger having viewed drugs and drug paraphernalia during the previous search").

The term "personal records" referred to patient records.  (FTR 12:34:02 – 12:34:16.) Indeed, Judge Mullis confirmed the meaning of "personal records" as patient files before signing the second warrant.  (Id.)  As Investigator Sikes testified, the pre-signed and identical forms he observed during the first search generally indicate a doctor is acting outside the usual course of professional practice.  (FTR 14:16:16 – 14:17:58.)  Therefore, a judge could reasonably find, based on the information in the affidavit, that there was "a fair probability that contraband or evidence of a crime" would have been found in the patient records to be seized.  Jiminez, 224 F.3d at 1248.

### 4.   Even If Probable Cause Did Not Exist to Support Issuance of the Warrants, the <u>Leon</u> Good Faith Exception Applies.

Even if the Court were to conclude probable cause did not support the warrants, an untenable position in light of all the information discussed above, the good faith exception to the exclusionary rule applies under <u>United States v. Leon</u>, 468 U.S. 897 (1984).

The judicially created remedy known as the exclusionary rule acts as a deterrent to violating the Fourth Amendment by preventing the use of evidence seized as a result of an illegal search.  <u>Martin</u>, 297 F.3d at 1312.  However, under <u>Leon</u>, the good faith exception allows the introduction of evidence in the prosecution's case in chief that is "seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate . . . ." <u>Leon</u>, 468 U.S. at 913.  The <u>Leon</u> Court explained that the good faith exception to the exclusionary rule is appropriate because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."  <u>Id.</u> at 916.  Thus, under <u>Leon</u>, the question becomes whether the officers executing the warrant reasonably relied on the issuing Superior Court Judge's determination of probable cause.  <u>Id.</u> at 913; <u>see also</u> <u>United States v. Herring</u>, 492 F.3d 1212, 1215 (11th Cir. 2007) ("[T]he exclusionary rule does not bar the use of evidence obtained by officers acting in good faith reliance on a warrant which is later found not to be supported by probable cause.").

Under <u>Leon</u>, there are four scenarios under which the good faith exception to the exclusionary rule would not apply.  The exception does not apply where the judge issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.  <u>Leon</u>, 468 U.S. at 923.  Nor does the exception apply in cases where the issuing judge "wholly abandoned" his or her

detached and neutral judicial role such that no reasonably well trained officer would rely on the warrant.  Id.  The warrant must not be based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and the warrant must not be so "facially deficient" that the executing officers could not reasonably presume it was valid.  Id.

Here, Defendant has not identified any reason the good faith exception would not apply.  There is no evidence of material omissions or misrepresentations in the warrants or supporting affidavits.   Nor did the issuing Superior Court Judge "wholly abandon" a detached and neutral role in issuing the warrants.   The warrant applications provided abundant information establishing probable cause.  The warrants are not facially deficient in any respect, and especially with regard to the issue of probable cause, that the executing officers could not reasonably presume them to be valid.

In sum, the Court concludes that even if probable cause to support issuance of the warrants had not been established, the Leon good faith exception to the exclusionary rule applies.

## 5.    A Georgia Superior Court Judge Properly Issued Both Warrants.

Defendant contends this was always a "'federal case' . . . with federal law enforcement being involved at every phase," and as such the search warrants violated Federal Rule of Criminal Procedure 41(b)(1), which requires search warrants be issued by a federal magistrate judge where reasonably available.  (Doc. no. 40, p. 8.)

"A search is federal in execution, thus implicating federal standards for the warrant, when federal officers provide intelligence to state officers during an investigation . . . ." United States v. Brown, 569 F. App'x 759, 762 (11th Cir. 2014).  Because Investigator

Sikes and Agent Wynn helped Oconee Drug Task Force officers with the investigation, the searches of 821 Plaza Drive were arguably federal in execution such that Rule 41 applies.

However, even if Rule 41 applies, Defendant has not established a violation. As the Eleventh Circuit explained in Brown,

> The language of Rule 41(b) grants authority to federal magistrates and state court judges to issue federal warrants when they are requested by federal agents or government attorneys. Fed. R. Crim. P. 41(b)(1). It does not speak to requests from state officers, as was the case here, nor does it ban a state warrant from being used during a joint state-federal investigation. . . . Additionally, neither the facts stipulated at the suppression hearing . . . detailed whether a federal magistrate was "reasonably available" when the warrant was issued by a state court judge, and [the defendant] does not address the issue in his brief. Since Rule 41 authorizes state courts to issue warrants when a federal magistrate is not "reasonably available," [the defendant] has not shown that it was improper for the state court to issue the warrant.

Id. at 763. Because the same reasoning applies here, neither search warrant violated Federal Rule of Criminal Procedure 41.

Accordingly, the Court **RECOMMENDS** Defendant's Motion to Suppress Evidence from 821 Plaza Drive be **DENIED**. (Doc. no. 40.)

> **D.    Defendant's Interview Remarks Should Not Be Suppressed Because Defendant Was Not In Custody and He Spoke Voluntarily.**

Defendant argues his interview statements should be suppressed because (1) he was in custody without Miranda warnings and a valid waiver of his Miranda rights; and (2) the officers dismissed his requests for an attorney and recording of the interview. (Doc. nos. 27; 62; 62-2, ¶¶ 24-25.)   The Court disagrees because, as discussed below, Defendant's testimony is not credible and the facts described by the officers on the scene show Defendant was not in custody during the interview.

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. "To give force to the Constitution's protection against compelled self-incrimination, the Court established in <u>Miranda</u>, 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" <u>Florida v. Powell</u>, 559 U.S. 50, 59 (2010) (quoting <u>Duckworth v. Eagan</u>, 492 U.S. 195, 201 (1989)). Under <u>Miranda</u>, prior to conducting a custodial interrogation, law enforcement officers must warn the interview subject that he has a "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).

The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u> When analyzing whether <u>Miranda</u> warnings are required, the Court must decide whether "'under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave.'" <u>United States v. Paige</u>, 241 F. App'x 620, 622 (11th Cir. 2007) (quoting <u>United States v. Phillips</u>, 812 F.2d 1355, 1360 (11th Cir. 1987)). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996). The objective standard contemplates the perspective of a reasonable, innocent person. <u>Paige</u>, 241 F. App'x at 622. Factors to consider include whether "'the officers brandished weapons, touched the suspect, or used

language or a tone that indicated compliance with the officer could be compelled.'"  United

States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting United States v. Long, 866

F.2d 402, 405 (11th Cir. 1989)).

"[A]lthough a reasonable person in the defendant's position may feel constrained not

to leave the scene of a police encounter at a particular moment—and thus may be deemed to

have been 'seized' by law enforcement—he will not necessarily be considered in 'custody'

for Fifth Amendment purposes."  United States v. Luna-Encinas, 603 F.3d 876, 881 (11th

Cir. 2010) (citing Street, 472 F.3d at 1310).  A person is "seized" when "a reasonable person

would not feel free to terminate the encounter" with the police.  Street, 472 F.3d at 1310.  For

Miranda purposes, a person is in custody "only when there is a formal arrest or restraint on

freedom of movement of the degree associated with a formal arrest."  Id. (quotation omitted).

Thus, even if a defendant is "seized," he may not be in "custody" as to require Miranda

warnings.

In Jackson v. Denno, 378 U.S. 368, 376 (1964), the Supreme Court explained that a

defendant is deprived of Due Process if he is convicted, based in any part, on an involuntary

confession.  Coercion may be mental or physical, Blackburn v. Alabama, 361 U.S. 199, 206

(1960), and "'[s]ufficiently coercive conduct normally involves subjecting the accused to an

exhaustingly long interrogation, the application of physical force or the threat to do so, or the

making of a promise that induces a confession.'"  United States v. Thompson, 422 F.3d

1285, 1295-96 (11th Cir. 2005) (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467,

1475 (11th Cir. 1992), abrogated on other grounds, Coleman v. Singletary, 30 F.3d 1420

(11th Cir.1994)).

32

It is undisputed the officers did not advise Defendant of his rights under <u>Miranda</u> before Defendant made statements to them.  However, suppression is not required because Defendant was not in custody at the time of the interview.

As an initial matter, the Court finds Officer Riddle's and Investigator Sikes' testimony regarding the circumstances of the questioning more credible than the contrary testimony of Defendant.  "[C]redibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  <u>United States v. Williams</u>, 731 F.3d 1222, 1230 (11th Cir. 2013) (citation omitted).  In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also his or her intelligence, state of mind, candor, and demeanor on the stand.  <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 749-50 (11th Cir. 2002).  A reviewing court must accept the fact finder's credibility determination "'unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact finder could accept it.'"  <u>Id.</u> at 749 (citation omitted).

Officer Riddle and Investigator Sikes testified in an intelligent, thoughtful, and candid manner, and it was clear to the Court they presented the facts as thoroughly and accurately as possible.  Both provided detailed accounts of their interactions with Defendant that were consistent in all material respects.  For example, both testified that five officers made initial entry into the office, none of the officers were in black SWAT gear, and no one had assault rifles or long guns during the search.  (FTR 12:15:45 – 12:16:07, 12:16:29 – 12:17:24, 12:17:24 – 12:17:34, 12:18:06 – 12:18:19, 12:44:52 – 12:45:14, 14:06:25 – 14:07:08, 14:10:28 – 14:10:42, 14:20:44 – 14:21:18.)

Both also testified consistently regarding the interview of Defendant.  Both testified only the two of them and Defendant entered Defendant's personal office, and Investigator Sikes told Defendant he was not under arrest, did not have to speak to them, and was free to leave.  (FTR 12:24:57 – 12:25:05, 12:25:06 – 12:25:16, 14:10:53 – 14:11:06, 14:11:21 – 14:11:26.)  Both confirmed Defendant willingly talked and never asked for a lawyer.  (FTR 12:25:00 – 12:25:05, 12:36:10 – 12:36:28, 14:11:27 – 14:11:58, 14:12:11 – 14:12:19.)  Finally, both candidly admitted the interview was never recorded.   (FTR 12:55:20 – 12:55:27, 14:26:40 – 14:28:32.)

Defendant's account, on the other hand, stands in complete contradiction to the corroborated testimony of the officers.  Defendant claims agents stormed his office in matching black SWAT gear.  (FTR 10:49:57 – 10:50:19.)  However, Officer Riddle and Investigator Sikes both testified that officers wore their standard, non-coordinated uniforms and calmly entered through the front door of the office.  (FTR 12:15:45 – 12:16:07, 12:16:29 – 12:17:24, 12:17:45 – 12:18:05, 12:18:26 – 12:18:50, 14:06:25 – 14:07:08, 14:07:17 – 14:07:54, 14:20:44 – 14:21:18.)  Defendant further testified ten to twelve officers entered the office, all of whom were armed and four of whom carried AR-15 assault rifles.  (FTR 10:51:44 – 10:52:15, 11:22:10 – 11:22:44, 11:23:15 – 11:23:48.)  However, Officer Riddle and Investigator Sikes testified only eight officers in total executed the warrant, only six officers in total entered the medical office, and no one executing the search had an assault rifle or any other type of long gun.  (FTR 12:15:10 – 12:15:44, 12:17:24 – 12:17:34, 12:18:06 – 12:18:19, 12:22:33 – 12:22:43, 12:44:52 – 12:45:14, 14:04:24 – 14:04:50, 14:05:12 – 14:05:28, 14:10:28 – 14:10:42.)  Defendant also contends an officer with an assault rifle guarded the entrance and exit to his office during his interview.  (FTR 11:08:27

– 11:08:41, 11:15:27 – 11:16:15.)  However, Officer Riddle and Investigator Sikes testified they were the only ones in the office with Defendant, no one guarded the door, and Agent Wynn entered the office only once to assist in the search for firearms.  (FTR 12:22:33 – 12:22:43, 12:26:44 – 12:26:55, 14:10:08 – 14:10:14, 14:12:45 – 14:13:09.)

Finally, and perhaps most suggestive of deception, Defendant alleged Investigator Sikes was armed throughout the search.  (FTR 11:12:29 – 11:12:41, 11:29:14 – 11:29:28.)  However, Investigator Sikes was not allowed to carry a weapon at all by virtue of his position as a diversion investigator.  (FTR 14:05:51 – 14:06:22.)  In sum, Defendant's self-serving and uncorroborated testimony is far less credible than the consistent testimony of Investigator Sikes and Officer Riddle.

The testimony of Officer Riddle and Investigator Sikes establishes Defendant was not "in custody" for purposes of Miranda.  In United States v. Matcovich, 522 F. App'x 850, 852 (11th Cir. 2013), the Eleventh Circuit determined an interview during execution of a search warrant on a defendant's boarding house was non-custodial.  The Court noted the following facts regarding the interview:

> (1) [the defendant] was unambiguously told that he was free to leave, was not in custody, and did not have to answer questions; (2) he was in the familiar and comfortable surroundings of his home; (3) he was not physically restrained during questioning; (4) the agents' weapons were holstered when they spoke with [the defendant]; (5) [a]lthough an officer accompanied [the defendant] throughout the house for safety reasons, he was free to go outside to smoke and move about the house to get dressed and make coffee; (6) there is no evidence that [the interviewing agent] conveyed his suspicion that [the defendant] was a perpetrator to [the defendant]; and (7) after the interview was over, [the defendant] left voluntarily with an FBI polygrapher and was not arrested until a later time[.]

Id. (internal quotations and citations omitted).

35

Here, Defendant's interview falls squarely in the purview of <u>Matcovich</u>.  Investigator Sikes told Defendant he was not under arrest, did not have to speak with the officers, and was free to leave.   Officer Riddle and Investigator Sikes interviewed Defendant in the comfort of his own office, where he was not handcuffed or restrained in any way, and officers never brandished their guns.  Defendant was also free to move around the entirety of the medical office.  Investigator Sikes did not reveal that Defendant was a suspect before or during the interview.  Finally, Defendant was only arrested after being allowed to leave the interview.   Under such circumstances, Defendant was not "in custody" for purposes of <u>Miranda</u> until the moment of his arrest, after the interview concluded.

Defendant contends he, his employees, and his patients were directed by officers to go to certain places within the medical office at certain times, and this automatically converts the execution of the search into a custodial circumstance.   (FTR 14:42:36 – 14:45:48, 14:47:26 – 14:48:08.)  However, minor restraints on freedom of movement generally do not convert a non-custodial setting to a custodial setting.  <u>See</u> <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006) ("Unambiguously advising a defendant that he is free to leave and is not in custody . . . generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'") (quoting <u>United States v. Muegge</u>, 225 F.3d 1267, 1271 (11th Cir. 2000)).  Therefore, even if officers gave Defendant some direction concerning where he should be in the office during the search, this does not convert the "totality of the circumstances" from non-custodial to custodial.  <u>See</u> <u>Matcovich</u>, 522 F. App'x at 852 (no custody where officers temporarily handcuffed residents and placed them in central location); <u>United States v. Varnell</u>, No. 1:13-CR-394, 2014 WL 5517923, at

36

*3, *7-8 (N.D. Ga. Oct. 28, 2014) (no custody where agent escorted all members of residence, including defendant, to living room while executing search); United States v. Graham, No. 3:13-CR-11-TCB, 2014 WL 2922388, at *3, *6-7 (N.D. Ga. June 27, 2014) (no custody where fifteen agents temporarily placed defendant and fellow residents in handcuffs and transported them to central location in house).

Accordingly, the Court **RECOMMENDS** Defendant's Motions to Suppress Statements be **DENIED**.  (Doc. nos. 27, 62.)

### E.     Defendant's Motion to Suppress Evidence from Storage Unit Seventy-Seven Is Moot.

The government did not seize any evidence from the search of storage unit seventy-seven.  (Doc. no. 55; FTR 14:55:46 – 14:56:18.)  Accordingly, the Court **RECOMMENDS** Defendant's Motion to Suppress Evidence from Storage Unit Seventy-Seven be **DENIED AS MOOT**.  (Doc. no. 41.)

### F.     Defendant Should Be Granted Better Access to the Voluminous Discovery.

Defendant seeks accommodations for him to be able to review the voluminous pretrial discovery.  (Doc. no. 37.)  In particular, Defendant asks, with the permission and cooperation of the Laurens County Sheriff's Office, for his defense counsel to bring him a computer to be left at the jail loaded with electronic copies of his patient files.  (FTR 15:03:43 – 15:04:03.) Defendant also seeks permission to be transported to his offices in Eastman and Dublin for a walkthrough with his defense counsel.  (FTR 14:57:00 – 14:57:12.)  The government suggests an alternative such as Skype or FaceTime to complete the walkthrough.  (FTR 15:05:23 – 15:05:54.)

The Court **RECOMMENDS** Defendant's request for a computer be **GRANTED** subject to approval by the Laurens County Sheriff's Office.   However, the Court **RECOMMENDS** Defendant's request for a walkthrough be **DENIED**.   There is no compelling reason why Defendant must serve as host.  There are other individuals who have access to both offices who can facilitate defense counsel's walkthrough.   Accordingly, the Court **RECOMMENDS** Defendant's Motion to Compel Access to Voluminous Information be **GRANTED IN PART** and **DENIED IN PART**.  (Doc. no. 37.)

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendant's Motion to Dismiss (doc. no. 26), Motions for a <u>Franks</u> Hearing (doc. nos. 42, 63), Motion to Suppress Evidence from 821 Plaza Drive (doc. no. 40), and Motions to Suppress Statements (doc. nos. 27, 62) be **DENIED**.  The Court further **RECOMMENDS** Defendant's Motion to Suppress Evidence from Storage Unit Seventy-Seven (doc. no. 41) be **DENIED AS MOOT** and Defendant's Motion to Compel Access to Voluminous Information (doc. no. 37) be **GRANTED IN PART** and **DENIED IN PART**.

SO REPORTED and RECOMMENDED this 27th day of September, 2017, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

38